**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Animal Legal Defense Fund; and Lockwood Animal Rescue Center, | **Case No. 17-cv-4496** |
| Plaintiffs, | Judge Joan N. Ericksen |
| v. | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, OR ALTERNATIVELY FOR PRELIMINARY INJUNCTION** |
| Fur-Ever Wild; Wolves, Woods & Wildlife; and Teresa Lynn Petter, | |
| Defendants. | Expedited Handling Requested |

**<u>PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, OR ALTERNATIVELY FOR PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

   I.   FUR-EVER WILD ..................................................................................... 3

      A.   Fur-Ever Wild's exhibition of animals ........................................ 3

      B.   Fur-ever Wild's systematic illegal killing of gray wolves. .......... 4

   II.   THE PLAINTIFFS ..................................................................................... 6

      A.   Animal Legal Defense Fund ........................................................ 6

      B.   Lockwood Animal Rescue Center ................................................ 8

   III.   EUREKA TOWNSHIP V. PETTER —STATE COURT ORDER LIMITING
       POSSESSION OF GRAY WOLVES ............................................................ 10

STATEMENT OF ISSUES ................................................................................ 11

ARGUMENT ...................................................................................................... 11

   I.   THE PLAINTIFFS WILL LIKELY SUCCEED ON THE MERITS OF THEIR
      CLAIM THAT FUR-EVER WILD IS VIOLATING THE ENDANGERED
      SPECIES ACT BY KILLING THREATENED WOLVES. .................................. 14

      A.   It is illegal under the Endangered Species Act to kill gray
          wolves in Minnesota ................................................................. 15

      B.   Fur-Ever Wild is violating the Endangered Species Act by
          killing gray wolves. ................................................................. 18

   II.   IRREPARABLE HARM WILL OCCUR ABSENT THE INJUNCTIVE RELIEF
      SOUGHT. ................................................................................................ 20

   III.   A BALANCE OF THE HARDSHIPS TIPS IN THE PLAINTIFFS' FAVOR, AND
      THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF. ............................. 23

   IV.   THIS COURT SHOULD EXERCISE ITS DISCRETION TO WAIVE ANY BOND,
      GIVEN THE IMPORTANT PUBLIC INTERESTS SERVED BY THE REQUESTED
      INJUNCTION. ......................................................................................... 26

CONCLUSION ........................................................................................................... 27

RELIEF SOUGHT ..................................................................................................... 27

CERTIFICATE OF COMPLIANCE ......................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Animal Legal Defense Fund v. Espy*, 23 F.3d 496 (D.C. Cir. 1994) ................................ 27

*Animal Legal Defense Fund v. LT Napa Partners LLC*, 234 Cal. App. 4th
1270 (2015) ................................................................................................. 22

*Ass'n of California Water Agencies v. Evans*, 386 F.3d 879 (9th Cir. 2004) ......... 2, 14, 22

*AVI Systems, Inc. v. McKitrick*, No. 16-2078 , 2016 WL 4146087 (D. Minn.
Aug. 4, 2016) (Ericksen, J.) ..................................................................... 15

*Bensman v. U.S. Forest Serv.*, 984 F. Supp. 1242 (W.D. Mo. 1997) ................... 13, 23, 24

*Burlington N. R. Co. v. Bair*, 957 F.2d 599 (8th Cir. 1992) ............................ 12, 13, 14, 20

*Dataphase Svs., Inc. v. CL Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) ........................ 12, 13

*Defenders of Wildlife v. Administrator, EPA*, 882 F.2d 1294 (8th Cir. 1989) ................. 15

*Dicesare v. Stout*, 992 F.2d 1222 (10th Cir. 1993) ............................................................ 27

*Eureka Township v. Petter*, 19HA-CV-15-2725 (Sept. 13, 2017) ............................... 1, 10

*Eureka Township v. Petter*, A17-0020 (Sept. 5, 2017) .......................................... 1, 10, 22

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .................................................... 21

*Hill v. Coggins*, 867 F.3d 499 (4th Cir. 2017) .................................................................. 17

*Kuehl v. Sellner*, 161 F. Supp. 3d 678 (N.D. Iowa 2016) ("*Kuehl I*") ............................ 16

*Kuehl v. Sellner*, No. 16-CV-2078-LRR, 2016 WL 9114915 (N.D. Iowa
July 21, 2016) ("*Kuehl II*") ..................................................................... 13, 16, 24

*National Wildlife Federation v. Harvey*, 440 F. Supp. 2d 940 (E.D. Ark.
2006) ................................................................................................................ 24

*National Wildlife Federation v. National Marine Fisheries Serv.*, 422 F.3d
782 (9th Cir. 2005) ........................................................................................ 13

*PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137 (8th Cir. 2007) ............................... 14

*Pennsylvania Co. for Ins. on Lives & Granting of Annuities v. Helvering*,

66 F.2d 284 (D.C. Cir. 1933) .................................................................27

*People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium,*
    189 F. Supp. 3d 1327 (S.D. Fla. 2016)..................................................22

*Planned Parenthood v. Rounds*, 530 F.3d 724 (8th Cir. 2008) .........................15

*Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963 (D. Minn. 2016)
    (Ericksen, J.)..........................................................................................15

*Richland/Wilkin Joint Powers Auth. v. United States Army Corps of
    Engineers*, 826 F.3d 1030 (8th Cir. 2016)...........................................26

*Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17 (D.D.C. 2013) ........................16

*Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir. 1987)* ......................................23

*Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011).............24, 25

*State v. Newcomb*, 359 Or. 756 (2016)..............................................................21

*State v. Nix*, 355 Or. 777 (2014) ......................................................................21

*Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978) .................................13

*United States v. Dion*, 752 F.2d 1261 (8th Cir. 1985).......................................25

*United States v. Hill*, 896 F. Supp. 1057 (D. Colo. 1995).................................25

*United States v. Stevens*, 559 U.S. 460 (2010) ..........................................21, 27

## STATUTES

16 U.S.C § 1540 .......................................................................................12, 20

16 U.S.C. § 1532 ..................................................................................2, 15, 16

16 U.S.C. § 1533 .......................................................................................... 16

16 U.S.C. § 3372 ...............................................................................................25

16 U.S.C. § 1531, *et seq.* (Endangered Species Act, or ESA)....................*passim*

REGULATIONS

63 Fed. Reg. 48634, 48636 (Sept. 11, 1998) .................................................. 16

80 Fed. Reg. 7380, 7388 (Feb. 10, 2015) ....................................................... 16

About, FUR-EVER WILD, http://www.fureverwild.org/about.html (last
    accessed October 4, 2017) .................................................................... 4

Fur-Ever Wild Business Record Details, MINNESOTA SECRETARY OF
    STATE, https://mblsportal.sos.state.mn.us/Business/
    SearchDetails?filingGuid=60cb628f-5915-e211-bc43-001ec94ffe7f
    (last accessed October 4, 2017) ............................................................ 3

FUR-EVER WILD, http://www.fureverwild.org (last accessed October 4,
    2017) ....................................................................................................... 4

Home Page, FUR-EVER WILD, http://www.fureverwild.org (last accessed
    October 4, 2017) .................................................................................... 4

Plan Your Visit, FUR-EVER WILD,
    http://www.fureverwild.org/plan_your_visit.html (last accessed
    October 4, 2017) .................................................................................... 4

Species Profile for Gray wolf (Canis lupus), U.S. FISH & WILDLIFE
    SERVICE,
    https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=A00D (last
    accessed Oct. 4, 2017) .......................................................................... 17

Wolves, Woods & Wildlife Business Record Details, MINNESOTA
    SECRETARY OF STATE, https://mblsportal.sos.state.mn.us/Business/
    SearchDetails?filingGuid=34990a03-8ed4-e011-a886-001ec94ffe7f
    (last accessed October 4, 2017) ............................................................ 3

OTHER AUTHORITIES

50 C.F.R. § 17.11 ................................................................................... 2, 17

50 C.F.R. § 17.31 ...................................................................................... 16

50 C.F.R. § 17.40 ................................................................................. 17, 18

50 C.F.R. § 17.40 ......................................................................................... 2

v

## INTRODUCTION

The Animal Legal Defense Fund and Lockwood Animal Rescue Center[1] are entitled to a temporary restraining order to stop Fur-Ever Wild from illegally killing federally-protected gray wolves in violation of the Endangered Species Act. Fur-Ever Wild breeds gray wolf puppies, and invites children to pet them and play with them. Then, when the wolves grow too old for such interactions, Fur-Ever Wild kills them, skins them, and sells their fur at its gift shop. Fur-Ever Wild has no credible argument to justify such illegal killing and, therefore, the standards for granting this emergency relief under Rule 65 of the Federal Rules of Civil Procedure are easily met. Congress itself has already made the conclusive determination that the public interest strongly favors preventing the irreparable harm that will occur if these protected wolves are killed.[2]

Emergency relief is necessary because there is an imminent risk that Fur-Ever Wild will slaughter all but one of its remaining wolves in a misguided and unlawful attempt to comply with a recent state court order generally prohibiting exotic animal ownership. *See* Ex. B-6, Minnesota Court of Appeals Opinion in *Eureka Township v. Petter*, A17-0020 (Sept. 5, 2017); Ex. B-7, Minnesota District Court Order in *Eureka Township v. Petter*, 19HA-CV-15-2725 (Sept. 13, 2017).

---

[1] The Plaintiffs are Animal Legal Defense Fund ("ALDF") and Lockwood Animal Rescue Center ("Lockwood"). The Defendants are Fur-Ever Wild ("FEW"), Wolves Woods & Wildlife ("WWW"), and Teresa Petter (collectively, "Fur-Ever Wild").

[2] Alternatively, the plaintiffs ask the Court grant this relief as a preliminary injunction.

The Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*prohibits killing, harming, or harassing endangered or threatened species. *See* 16 U.S.C. §§ 1532(19); 1538(a). Gray wolves are threatened throughout Minnesota, and endangered in most of the country. 50 C.F.R. §§ 17.11(h) & 17.40(d). The purpose of the plaintiffs' motion is thus to immediately halt any possibility of Fur-Ever Wild killing the wolves or sending them off-site to another facility where they may die.

Injunctive relief is needed to prevent irreparable harm by Fur-Ever Wild's continued killing of federally-protected animals. As discussed below, the plaintiffs have a high likelihood of success on the merits because the defendants are openly violating the ESA by killing gray wolves as part of their mixed exhibition, breeding, and pelting business operation.

In ESA cases, a TRO should be granted on a showing of likelihood of success on the merits alone. Nonetheless, the gray wolves themselves will suffer irremediable harm if they are killed. The plaintiffs will also suffer irreparable harm unless emergency relief is provided, because the plaintiffs will continue diverting significant organizational resources to counteract Fur-Ever Wild's killing of gray wolves.[3] Moreover, the balance of equities tip sharply in the plaintiffs' favor because the requested relief is exactly tailored to preventing the plainly unlawful death of threatened gray wolves and therefore will not

---

[3] Because the ESA citizen suit provision does not allow for damages, *see Ass'n of California Water Agencies v. Evans*, 386 F.3d 879, 885 (9th Cir. 2004), these resource expenditures cannot be recompensed.

otherwise interfere with Fur-Ever Wild's business operations.

## STATEMENT OF FACTS

### I.   FUR-EVER WILD

Petter owns and operates two entities known as Fur-Ever Wild and Wolves, Woods & Wildlife, which began exhibiting and breeding animals in Lakeville, Minnesota around 2007.[4] For simplicity, all defendants are collectively referred to as "Fur-Ever Wild."

### A.   Fur-Ever Wild's exhibition of animals

Fur-Ever Wild keeps and displays numerous animals on its Lakeville, Minnesota property, including gray wolves,[5] cougars, foxes, bobcats, prairie dogs, woodchucks, porcupines, raccoons, skunks, deer, horses, pigs, goats, and chickens. *See* Ex. B-10, USDA Inspection Report (June 21, 2016);[6] Ex. B-1, Petter Dep. at 15; Ex. A, Simmons Decl. ¶

---

[4] *See* Ex. B-1, Petter Dep. at 6–11; *see also* Fur-Ever Wild Business Record Details, MINNESOTA SECRETARY OF STATE, https://mblsportal.sos.state.mn.us/Business/Search Details?filingGuid=60cb628f-5915-e211-bc43-001ec94ffe7f (last accessed October 4, 2017); Wolves, Woods & Wildlife Business Record Details, MINNESOTA SECRETARY OF STATE, https://mblsportal.sos.state.mn.us/Business/SearchDetail?filingGuid=34990a03-8ed4-e011-a886-001ec94ffe7f (last accessed October 4, 2017).

[5] Fur-Ever Wild labels these animals as gray wolves on its signage. Ex. A, Simmons Decl. ¶ 18; Ex. B-3, Nasser Letter at 9, 11. Fur-Ever Wild also reports them as gray wolves to the USDA as part of federal regulation under the Animal Welfare Act. Ex. B-10, USDA Inspection Report (June 21, 2016) at 3. Lockwood's director of operations, Simmons, observed approximately forty wolves on exhibit at Fur-Ever Wild, and confirmed that these animals were in fact gray wolves based on ten years of experience handling various types of wolves and wolf-dogs on a regular basis. Ex. A, Simmons Decl. ¶ 18.

[6] The most recent USDA inspection report that included an animal inventory specifically recorded the following number and species of animals: 5 cattle/cow/ox/watusi, 4 striped skunk, 2 arctic fox, 3 sheep or mouflon, 7 raccoon, 2 black-tailed prairie dog, 5

18; Home Page, FUR-EVER WILD, http://www.fureverwild.org (last accessed October 4, 2017); Plan Your Visit, FUR-EVER WILD, http://www.fureverwild.org/plan_your_visit.html (last accessed October 4, 2017).

Fur-Ever Wild's main attractions are the gray wolves. Every spring, Fur-Ever Wild welcomes multiple litters of wolf puppies born at the facility. *See*, e.g., Ex. B-18, FEW Game Farm Report (2017); Ex. B-25, WWW Game Farm Report (2017) (7 wolves collectively born at operation). Children are invited to Fur-Ever Wild to view the wolves and other animals. *See* Ex. B-1, Petter Dep. at 13–16, 62–63; *see also* About, FUR-EVER WILD, http://www.fureverwild.org/about.html (last accessed October 4, 2017) ("We offer engaging live animal demonstrations as adult and children's programs"). In addition to paying to feed the animals, visitors are invited to have "close-up encounters" with the animals, and to come "face-to-face" with them. *See* Home Page, FUR-EVER WILD, http://www.fureverwild.org (last accessed October 4, 2017). Visitors are even allowed to touch the wolves for $20 "pet-n-plays." *See* Ex. B-3, Nasser Letter; Ex. B, Liebman Decl. ¶ 11.

**B.    Fur-ever Wild's systematic illegal killing of gray wolves.**

In order to sustain its business model of breeding wolf puppies for pet-n-plays, Fur-Ever Wild must dispose of a number of wolves roughly equal to the number that are born.

---

puma/mountain lion/cougar, 21 goat, 18 white-tailed deer, 4 North American porcupine, 5 bobcat, 1 fisher, 42 grey/gray wolf, 19 red fox, 5 European rabbit, and 15 domestic pig. Ex. B-10, USDA Inspection Report (June 21, 2016).

Fur-Ever Wild accomplishes this by killing young wolves when they are no longer puppies, and selling their pelts and other parts for profit.

Fur-Ever Wild makes no secret of the fact that it pelts wolves and other animals at its facility. Petter admitted in a deposition that all the animals at Fur-Ever Wild are raised for fur, except the pigs and goats. Ex. B-1, Petter Dep. at 24. As part of that deposition, Petter described skinning two wolves the previous night and indicated her intent to pelt more: "I pelted two wolves last night. [ ] And there is another two going tonight. And then the rest of them go. There will be 25 within the next three weeks – two weeks." *Id.* at 25.

Fur-Ever Wild describes itself as a "pro-[fur] trapping" business and sells the furs, tails, and other body parts of its animals at the on-site gift shop. *See* Ex. B-1, Petter Dep. at 67–69; Ex. A, Simmons Decl. ¶¶ 10, 23; Ex. B, Liebman Decl. ¶ 15; Ex. B-4, Wolf Pelts. The facility has no wolves apparently older than five years old despite breeding wolves since 2007, giving rise to the inference all of its wolves die prematurely. Ex. A, Simmons Decl. ¶ 22.

Fur-Ever Wild's gray wolf killing is further documented in annual game farm applications and reports that Fur-Ever Wild and Wolves Woods & Wildlife submit to the Minnesota Department of Natural Resources in connection with state law regulations. From March 1, 2012 through February 28, 2017, Fur-Ever Wild's death rate nearly matched its birth rate of gray wolves. During that period, Fur-Ever Wild reported the "deaths (…butchered for consumption)" of 68 wolves, the sale of 10 wolves, and the birth

of 109 wolves.[7,8,9]

Significantly, Fur-Ever Wild's state game farm reports to the Minnesota Department of Natural Resources are *underreporting* the number of wolf deaths, as United States Department of Agriculture (USDA) inspectors have counted many fewer wolves at the facility than reported in the game farm reports. *Compare* Ex. B-10, USDA Inspection Report (June 21, 2016) (counting 42 "grey/gray wolf" animals at site), *with* Exs. B-18 & B-25, FEW and WWW Game Farm Reports (2017) (reporting a collective range of 49 to 65 wolves under the operation's ownership between March 1, 2016 and February 28, 2017).

## II.   THE PLAINTIFFS

### A.   Animal legal Defense Fund

---

[7] Ex. B-14, FEW Game Farm Report (2012); Ex. B-20, WWW Game Farm Report (2012); Ex. B-15, FEW Game Farm Report (2013); Ex. B-21 WWW Game Farm Report (2013); Ex B-22, WWW Game Farm Report (2014); Ex. B-16, FEW Game Farm Report (2015); Ex. B-23, WWW Game Farm Report (2015); Ex. B-17, FEW Game Farm Report (2016); Ex. B-24, WWW Game Farm Report (2016); Ex. B-18, FEW Game Farm Report (2017); Ex. B-25, WWW Game Farm Report (2017).

[8] Plaintiffs do not have a copy of Fur-Ever Wild's 2014 game farm report to the Minnesota Department of Natural Resources. However, Fur-Ever Wild and Wolves, Woods & Wildlife are the same operation located at the same property under the direction of the same principals (Petter and her partner Daniel Storlie.)

[9] For reasons unknown to Plaintiffs, Petter and Storlie divided the gray wolves between Fur-Ever Wild and Wolves Woods & Wildlife in their 2016 and 2017 game farm reports despite never doing that before in reports for previous years. The births, sales, and deaths for gray wolves must be added together from both facilities for those two years to provide a complete picture of the gray wolf activity there.

ALDF is a national nonprofit animal protection organization that uses education, public outreach, investigations, legislation, and litigation to protect the lives and advance the interests of animals, including those raised in captivity. *See* Ex. B, Liebman Decl. ¶¶ 3–7.

ALDF first became aware of Fur-Ever Wild in 2015. An ALDF supporter complained to ALDF about the defendants breeding wolves, encouraging customers to interact with them, and then killing them. *Id.* ¶¶ 8–9. ALDF began investigating Fur-Ever Wild in response to that complaint. *Id.* ¶ 13.

Concerned by the killing of gray wolves, selling of gray wolf parts, and failure to provide adequate veterinary care, ALDF submitted a letter to the USDA on May 19, 2015, seeking an inspection and enforcement action against Fur-Ever Wild. Ex. B-2, ALDF Letter to USDA; Ex. B, Liebman Decl. ¶ 14. ALDF continued investigating the Fur-Ever Wild operation and on October 11, 2015, sent employee Carney Anne Nasser to investigate and photograph the defendants' facility. *See id.* ¶ 15; Ex. B-3, Nasser Letter at 2. On October 15, 2015, Nasser immediately sent a letter to the USDA documenting her observations relating to the defendants' welfare violations. *See* Ex. B-3, Nasser Letter; Ex. B, Liebman Decl. ¶ 15.

On December 2, 2015, ALDF sent the defendants and the Secretary of Interior a notice letter signaling ALDF's intent to sue over ESA violations surrounding the facility's killing and failure to provide proper care to threatened gray wolves. *See* Ex. B, Liebman Decl. ¶ 16; Ex. B-5, Notice Letter. After sending the notice letter, ALDF continued to monitor the defendants, researched the cruelty implication of Fur-Ever Wild's operation,

7

and engaged in conversations with several concerned persons inside and outside of ALDF. *See* Ex. B, Liebman Decl. ¶¶ 17–20.

### B.    Lockwood Animal Rescue Center

Lockwood is a nonprofit wildlife rescue organization with a focus on protecting wolves by providing sanctuary for captive wolves, policy advocacy for wolves, and protection for wild wolves. *See* Ex. A, Simmons Decl. ¶¶ 2–3.

Lockwood became aware of the defendants in 2015 because of events that occurred while Lockwood was working to protect wild gray wolves from a wolf hunt. *See id.* ¶ 8. Hunt organizers, aware of Lockwood's efforts, posted pictures of themselves holding up dead gray wolves on social media. *Id.* ¶ 8. Lockwood's director of operations, Matthew Simmons, perceived these images as directed to Lockwood and other wild wolf advocates. *Id.* ¶ 8. Upon investigating, Simmons learned from an online discussion board that the hunt organizers acquired these gray wolves from Fur-Ever Wild. *Id.* ¶¶ 9, 11.

As a result, Lockwood began to investigate Fur-Ever Wild. *Id.* ¶ 10. Lockwood researched Fur-Ever Wild online and began to communicate with people connected to Petter. *Id.* ¶ 10.

Simmons fears that Fur-Ever Wild will continue to provide dead wolves to people, and that such occurrences will continue to divert Lockwood from pursuing its normal activities. Ex. A, Simmons Decl. ¶ 13. The exploitation of the wolves living and dying under the defendants' control is of grave concern to Lockwood, particularly because they disrupt Lockwood's wolf protection efforts. *See id.* ¶¶ 12–13, 15. Moreover, Lockwood's credibility and reputation with supporters, charitable donors, and the public at large would

8

be jeopardized if it did nothing to counteract Fur-Ever Wild's killing of gray wolves, selling of gray wolf parts, and failing to provide proper care for wolves. *See id.* ¶ 15.

In 2016, Lockwood invested a significant amount of resources to investigate and counteract Fur-Ever Wild's exhibition and pelting operation because of these concerns. *See id.* ¶ 16. These efforts included flying Lockwood Director of Operations Matthew Simmons and President Lorin Lindner to Minnesota to investigate and counteract the defendants' operation. Simmons and Lindner spent one week in the area, resulting in the cost of several nights in a hotel, a car rental, and other travel costs. *See id.* ¶ 17. While there, Simmons paid admission to visit the Fur-Ever Wild facility. *See id.* ¶ 18.

At the facility, Simmons observed several enclosures with "gray wolf" signage containing approximately 40 gray wolves. *See id.* ¶ 18. While there, Simmons observed untreated infections on some wolves, two wolves with serious eye infections, and one wolf with a pronounced limp. *See id.* ¶ 19. Simmons also observed visitors feeding the wolves large amounts of hot dogs, which are not nutritious but appeared to be a part of their regular diet. *See id.* ¶ 21.

Simmons also observed gray wolf pelts and teeth for sale in the Fur-Ever Wild gift shop. *See id.* ¶¶ 23–24. He also noticed that there were no wolves older than five years old, which would be unexpected for a normal operation because the facility has kept and bred gray wolves since 2007. Ex. A, Simmons Decl. ¶ 22.

After visiting Fur-Ever Wild, Simmons arranged several meetings with local law enforcement officials to ask them to take action against Fur-Ever Wild due to the legal violations he observed. *Id.* at ¶ 26. Lockwood continued following developments relating

to Fur-Ever Wild after the visit, and continued to encourage law enforcement. *Id.* at ¶ 27. Lakewood also developed plans to rescue the animals there and purchased equipment to carry out a rescue operation, due to an anticipation that such a rescue may become necessary. *Id.* at ¶ 27.

### III. EUREKA TOWNSHIP V. PETTER —STATE COURT ORDER LIMITING POSSESSION OF GRAY WOLVES

On July 31, 2015, the Township of Eureka filed a civil lawsuit against Fur-Ever Wild for violating its local ordinance prohibiting the possession of exotic animals. That case ended up before the Minnesota Court of Appeals, which held in an opinion issued on September 5, 2017 that the township's ordinance was valid, and prohibited Fur-Ever Wild's possession of all wild (i.e. exotic) animals except for one wolf. Ex. B-6, Minnesota Court of Appeals Opinion in *Eureka Township v. Petter*, A17-0020 (Sept. 5, 2017). On September 13, 2017, the state district court entered an injunction enjoining possession of exotic animals except for one wolf. *See* Ex. B-7, Minnesota District Court Order in *Eureka Township v. Petter*, 19HA-CV-15-2725 (Sept. 13, 2017).

Neither the township's ordinance nor the state district court's injunction address the *method* by which Fur-Ever Wild must dispossess itself of these protected animals. *Id.* Rather, it is only the ESA—and the plaintiffs' claims asserted in this Court—that address that question and prohibit the killing of these protected animals.

In response to the Minnesota Court of Appeals decision regarding the defendants, Lockwood sent a member from New York to Minnesota to attend a Eureka Township meeting on September 11, 2017. Ex. A, Simmons Decl. ¶ 28. While there, Lockwood

pressed local officials to shut the defendants' facility down, which to date has not occurred. *Id.* ¶ 28.

On September 26, 2017, ALDF sent another enforcement letter to USDA regarding concerns with Fur-Ever Wild. Ex. B, Liebman Decl. ¶ 27. On September 27, 2017, ALDF sent a letter to local officials to offer to assist with any law enforcement effort against Fur-Ever Wild regarding violations of the local wild animal prohibition, animal cruelty, or Endangered Species Act violations. *Id.* ¶ 28.

Both Lockwood and ALDF are now concerned that, in an attempt to comply with the local ordinance, Fur-Ever Wild may kill its remaining gray wolves as it has done in the past—or else sell these animals to others who will kill them. Ex. A, Simmons Decl. ¶¶ 29; Ex. B, Liebman Decl. ¶¶ 20-22. As long as the wolves' lives remain in jeopardy, Lockwood and ALDF will continue trying ardently to prevent the defendants from killing the wolves, by talking to local officials, and by investigating the operation. Ex. A, Simmons Decl. ¶ 30; Ex. B, Liebman Decl. ¶ 29.

## STATEMENT OF ISSUES

Whether a TRO or preliminary injunction should be entered precluding the defendants from continuing to kill the federally-protected gray wolves in their possession.

## ARGUMENT

Plaintiffs only need to show a likelihood of success on the merits to obtain emergency injunctive relief under the ESA. The plaintiffs meet that burden here because Fur-Ever Wild is killing gray wolves which is plainly prohibited by the ESA. Irreparable harm, the balance of the equities, and the public interest weigh in the plaintiffs' favor as

well because there is no way to bring a wolf back to life, and an injunction against killing gray wolves will not otherwise burden Fur-Ever Wild's operation.

Courts typically consider four factors in deciding whether to grant a TRO or preliminary injunction:

> (1) the threat of irreparable harm to the movant;
>
> (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant;
>
> (3) the probability that movant will succeed on the merits; and
>
> (4) the public interest.

*Dataphase Svs., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

In cases brought under the ESA, however, this Court should issue a TRO or preliminary injunction based solely on a plaintiff's showing of probability of success on the merits:

> [W]here Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction. In such situations, it is not the role of the courts to balance the equities between the parties. The controlling issue is whether Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits. The proper role of the courts is simply to determine whether a violation of the statute has or is about to occur.

*Burlington N. R. Co. v. Bair*, 957 F.2d 599, 601–02 (8th Cir. 1992) (citations omitted).

The ESA is one such statute in which Congress expressly provides for injunctive relief to prevent violations. 16 U.S.C § 1540(g)(1)(A) and (e)(6). Thus, two courts in this Circuit have explained that, in an ESA case, a court may grant a TRO or preliminary

12

injunction even without addressing the four *Dataphase* factors. *Kuehl v. Sellner*, No. 16-CV-2078-LRR, 2016 WL 9114915, at *2 (N.D. Iowa July 21, 2016) ("*Kuehl II*"); *Bensman v. U.S. Forest Serv.*, 984 F. Supp. 1242, 1245–46 (W.D. Mo. 1997). As *Kuehl II* explained,

> [s]ome courts have found that "the traditional preliminary injunction analysis does not apply to injunctions issued pursuant to the Endangered Species Act." *National Wildlife Federation v. National Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005). This is because, by enacting the Endangered Species Act, "Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interest." *Id.* at 794. Instead, Congress made it "abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Id.* (quoting *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194 (1978)). The Eighth Circuit Court of Appeals has similarly indicated that the traditional factors do not apply to cases involving the violation of an explicit statutory provision. *See Burlington [ ]*, 957 F.2d [at] 601–02.

2016 WL 9114915, at *2 (some citations omitted); *see also Bensman*, 984 F. Supp. at 1245 ("[S]ome courts have held that when a preliminary injunction concerns the ESA, the traditional balancing of hardships is inapplicable.").

In both *Kuehl II* and *Bensman*, the courts granted emergency relief to enjoin ESA violations, holding that the plaintiffs had met their burden regardless of whether the traditional factors applied. *See* 2016 WL 9114915, at *2; 984 F. Supp. at 1246, 1250.

Here, the plaintiffs are likely to prevail on the merits because killing threatened gray wolves in Minnesota unambiguously qualifies as a take in violation of the ESA. *See* 16 U.S.C. §§ 1532(19); 1538(a).

Although the plaintiffs' showing of probability of success on the merits alone is sufficient for the Court to enter a TRO, the other factors weigh in the plaintiffs' favor as

13

well. Fur-Ever Wild's continued killing of the threatened gray wolves will cause irreversible harm to the wolves, as a dead animal cannot be brought back to life. Such killing will also cause irreversible harm to ALDF and Lockwood, who must continue expending resources to counteract the activity and cannot obtain damages under the ESA with which to recompense their expenditures. *See Ass'n of California Water Agencies v. Evans*, 386 F.3d 879, 885 (9th Cir. 2004). By contrast, Fur-Ever Wild will not suffer any legally-cognizable harm by being restrained from taking wolves to a shed and pelting them, as this will not interfere with any lawful[10] aspect of Fur-Ever Wild's business operation.

I. **THE PLAINTIFFS WILL LIKELY SUCCEED ON THE MERITS OF THEIR CLAIM THAT FUR-EVER WILD IS VIOLATING THE ENDANGERED SPECIES ACT BY KILLING THREATENED WOLVES.**

As discussed above, showing a likelihood of success on the merits is by itself sufficient to grant a TRO or preliminary injunction in an ESA case. *Burlington*, 957 F.2d at 602.

"In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143–44 (8th Cir. 2007) (citations and internal quotation marks omitted). "While an injunction cannot issue if there is no chance on the merits, the Eighth Circuit has rejected a requirement [that] a party seeking preliminary relief prove a greater than

---

[10] The aspect of Fur-Ever Wild's business that involves selling gray wolf fur is unlawful. See 16 U.S.C. § 3372(a)(1) ("It is unlawful for any person to . . . sell . . . any [ ] wildlife [ ] taken . . . in violation of any law[ ] of the United States.").

fifty per cent likelihood that he will prevail on the merits." *Id*. Rather, "[i]n the typical case, a movant need only show that she possesses a 'fair chance of prevailing' on the merits of her claim, with the line demarcating a 'fair chance' being less than 50 percent." *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 974 (D. Minn. 2016) (Ericksen, J., granting preliminary injunction) (citing *Planned Parenthood v. Rounds*, 530 F.3d 724, 730–33 (8th Cir. 2008)); *see also AVI Systems, Inc. v. McKitrick*, No. 16-2078 , 2016 WL 4146087, at *2 (D. Minn. Aug. 4, 2016) (Ericksen, J. granting motion for temporary restraining order) ("At this early stage, the Court concludes that [the plaintiff] has demonstrated that it is likely to succeed on the merits of its allegations against [the defendant]; that is, [the plaintiff] has a 'fair chance of prevailing' on the merits.").

The plaintiffs here can easily meet this standard, because the defendants are openly violating the ESA by killing threatened gray wolves. Moreover, this Court has jurisdiction to grant relief in this case because the plaintiffs have satisfied all jurisdictional requirements including standing to bring this lawsuit.

### A.  It is illegal under the Endangered Species Act to kill gray wolves in Minnesota.

In passing the ESA, Congress "afforded endangered species 'the highest of priorities.'" *Defenders of Wildlife v. Administrator, EPA*, 882 F.2d 1294, 1300 (8th Cir. 1989) (quoting *Tennessee Valley Authority*, 437 U.S. at 174). To accomplish this goal, the ESA prohibits the "take" of a listed species by any person. *See* 16 U.S.C. § 1538(a). "Take" is defined broadly to mean "to harass, harm, pursue, hunt, shoot, wound, *kill*, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (emphasis

added).

The protections for endangered species generally apply with equal force to threatened species. 16 U.S.C. § 1533(d) (authorizing FWS to extend take protection to threatened species by regulation); 50 C.F.R. § 17.31(a) (generally extending take protection to threatened species by regulation).

In addition to prohibiting takes themselves, the ESA prohibits the sale of illegally taken animals and animal parts. *See* 16 U.S.C. § 1538(a)(1)(D) (prohibiting possession and sale of illegally taken wildlife); 16 U.S.C. § 1532(8) (the term "wildlife" includes "dead body or parts thereof"). It also prohibits causing another party to take a protected species. 16 U.S.C. § 1538(g).

The ESA's take prohibition applies to animals equally, regardless of whether they live in captivity or the wild. *See* 16 U.S.C. § 1532(8). The FWS, which oversees enforcement of the ESA, has repeatedly explained that the ESA applies to both wild and captive populations of a species. 63 Fed. Reg. 48634, 48636 (Sept. 11, 1998) (explaining that Congress defined "take" to apply to endangered or threatened wildlife "whether wild or captive"); 80 Fed. Reg. 7380, 7388 (Feb. 10, 2015) (final rule listing captive orca Lolita as a member of the Endangered Southern Resident Killer Whale Distinct Population Segment). Courts have upheld this directive. *See, e.g., Kuehl II*, 2016 WL 9114915, at *3 (issuing TRO to stop ESA violations committed against captive animals); *Kuehl v. Sellner*, 161 F. Supp. 3d 678, 718 (N.D. Iowa 2016) ("*Kuehl I*") (finding ESA violations against captive animals); *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 30 (D.D.C. 2013) ("[L]istings are made without distinction between wild or captive populations, populations

of native or non-native species or species that are bred in captivity.") (internal quotation marks omitted).

The Gray Wolf, *canis lupus*, is a listed species under the ESA. *See* 50 C.F.R. § 17.11(h) (listing "Wolf, gray" under the "List of Endangered and Threatened Wildlife" subject to the ESA's protections). The gray wolf has been classified as an endangered species in most of the United States since 1978, and has been listed as threatened in Minnesota since then except for a period between January 2012 and December 19, 2014. *See Species Profile for Gray wolf (Canis lupus)*, U.S. FISH & WILDLIFE SERVICE, https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=A00D (last accessed Oct. 4, 2017). The FWS describes the wolf as "an integral component of the ecosystems to which it typically belongs." *Id.*

An individual who takes a wolf, for instance by killing, harming, or harassing the animal, violates the ESA and is subject to civil or criminal penalties under the Act. *See* 16 U.S.C. §§ 1538(a) & 1540(a)–(b); *see also Hill v. Coggins*, 867 F.3d 499, 508–11 (4th Cir. 2017) (explaining ESA's "take" prohibition and applying law to captive members of threatened bear species).

The Code of Federal Regulations provides a specific rule for gray wolves in Minnesota. 50 C.F.R. § 17.40(d). That rule reflects general protection for endangered and threatened wildlife by prohibiting anyone from: (1) taking a gray wolf in Minnesota; (2) selling, offering to sell, transporting, shipping, carrying, delivering, or receiving any Minnesota gray wolf in interstate commerce; or (3) possessing, selling, delivering, carrying, transporting, or shipping a gray wolf or her parts. 50 C.F.R. § 17.40(d)(2)(i)-

17

(iii).[11]

### B.    Fur-Ever Wild is violating the Endangered Species Act by killing gray wolves.

Fur-Ever Wild is violating the ESA's take prohibition through its systematized killing and skinning of gray wolves for their pelts and other parts.[12]

As detailed at length in the Statement of Facts, *supra* at 3–11, breeding and pelting wolves is intrinsic to Fur-Ever Wild's business model. The best evidence of this comes from statements by Petter herself: "I pelted two wolves last night. [ ] And there is another two going tonight. And then the rest of them go. There will be 25 within the next three weeks – two weeks." Ex. B-1, Petter Dep. at 25.

Since that deposition was taken, Fur-Ever Wild's game farm reports to the Minnesota Department of Natural Resource include numerous wolf deaths that are similar in number to wolf births during the same period. Specifically, Fur-Ever Wild reported 68 wolf "deaths" and 10 wolf "sales" to undisclosed buyers from the period between March 1, 2011 and February 28, 2017.[13] During the same period, the same records indicate 109

---

[11] The special rule allows limited taking of gray wolves in certain situations such as to protect domestic animals. 50 C.F.R. § 17.40(d)(2)(i). None of those exceptions apply here.

[12] Although the ESA provides a process to obtain permits to take threatened and endangered wildlife, 16 U.S.C. § 1539(a)(1), there is no indication that Fur-Ever Wild has ever obtained such a permit to take gray wolves. Fur-Ever Wild would not qualify for such a permit. No other exceptions apply.

[13] Ex. B-14, FEW Game Farm Report (2012); Ex. B-20, WWW Game Farm Report (2012); Ex. B-15, FEW Game Farm Report (2013); Ex. B-21, WWW Game Farm Report (2013); Ex B-22, WWW Game Farm Report (2014), Ex. B-16, FEW Game Farm Report (2015);

wolf "births." *Id.* The most recent game farm reports filed with the Minnesota Department of Natural Resources in 2017 report 8 wolf births, 7 wolf deaths, and 1 wolf sale for the period between March 1, 2016 and February 28, 2017. Ex. B-18, FEW Game Farm Report (2017); Ex. B-25, WWW Game Farm Report (2017).

Fur-Ever Wild's reports to the Department of Natural Resources appear to undercount the number of wolf deaths. For the same period between March 1, 2016 and February 28, 2017, Fur-Ever Wild's game farm reports indicate a range of 49 to 62 wolves at all times. However, the USDA counted only 42 "gray wolf" animals when it inspected Fur-Ever Wild on June 21, 2016. Thus, there were at least 7 gray wolves unaccounted for, and as many as 20.

Fur-Ever Wild's inability to account for gray wolves is not limited to numerical deductions from regulatory reports. Very recently on August 29, 2017, the USDA inspected Fur-Ever Wild and specifically cited it for disposing of two gray wolves without keeping disposition records regarding the wolves' whereabouts as required by federal Animal Welfare Act regulations. Ex. B-8, USDA Inspection Report (Aug. 29, 2017). USDA inspectors also cited Fur-Ever Wild for failing to provide adequate veterinary care to a wolf with an open wound on her shoulder, and failing to provide adequate shade from the sun. *Id.*

---

Ex. B-23, WWW Game Farm Report (2015); Ex. B-17, FEW Game Farm Report (2016); Ex. B-24, WWW Game Farm Report (2016), Ex. B-18, FEW Game Farm Report (2017); Ex. B-25, WWW Game Farm Report (2017).

Fur-Ever Wild describes itself as a fur farm, reported almost as many wolves dead last year (7 deaths) as were born (8 births), and failed to keep disposition records for wolves as required under federal law. One need look no further than Fur-Ever Wild's gift shop lest there remain any doubt whether the facility kills its wolves. Lockwood's Matthew Simmons observed gray wolf pelts and teeth for sale when he visited the Fur-Ever Wild facility in September 2016, among pelts and parts for other species of animals that also lived at the menagerie. Ex. A, Simmons Decl. ¶ 23. ALDF's Carney Anne Nasser also photographed gray wolf pelts when she visited the facility in October 2015. Ex. B-4, Wolf Pelts; Ex. B, Liebman Decl. ¶ 15.

In sum, the plaintiffs have ample evidence to prevail on their claim that Fur-Ever Wild takes threatened gray wolves in violation of the ESA. Thus, the plaintiffs have a likelihood of success on the merits.

## II. IRREPARABLE HARM WILL OCCUR ABSENT THE INJUNCTIVE RELIEF SOUGHT.

As discussed above, this Court need not engage in an irreparable harm analysis in order to issue a TRO or preliminary injunction. "It is a well-established rule that where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction." *Burlington*, 957 F.2d at 601–02 (citations omitted). In the ESA, Congress expressly provides for injunctive relief. *See* 16 U.S.C § 1540(g)(1)(A). Thus, this court may issue a TRO or preliminary injunction on the sole basis that it finds that "a violation of the [ESA] has or is about to occur." *Burlington*, 957 F.2d at 602.

That said, irreparable harm will occur absent a TRO or preliminary injunction. First, the wolves themselves have an interest as individuals in continuing to live and in their own well-being. It has been recognized that a violation of law may be committed "against an animal," and that an animal may be the "victim" of such a violation. *State v. Nix*, 355 Or. 777, 790 (2014) (internal quotation marks omitted), *vacated on other grounds*, 356 Or. 768 (2015); *see also State v. Hess*, 273 Or. App. 26, 35 (2015) (adopting the reasoning in Nix and discussing the vacation of that case); *United States v. Stevens*, 559 U.S. 460, 495-97 (2010) (Alito, S., dissenting) (finding that a compelling interest to restrict animal crush videos under the First Amendment exists by emphasizing animals' significant capacity to suffer: "animals used in crush videos are living creatures that experience excruciating pain [and] [o]ur society has long banned such cruelty); *State v. Newcomb*, 359 Or. 756 (2016) (veterinarian's warrantless withdrawal and testing of abused dog's blood to administer medical treatment did not violate the Fourth Amendment). No amount of money can bring a dead animal back to life.

Second, the plaintiffs have an interest in no longer having their organizational resources diverted to counteracting the defendants' illegal behavior. The Supreme Court has recognized that organizations have a legally-cognizable interest in not having their resources diverted to combatting an entity's illegal behavior. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that civil rights group had standing due to its interest in no longer diverting resources to combat defendant's illegal housing discrimination). This rule applies to animal protection organizations that expend resources counteracting illegal actions toward animals. *See People for the Ethical Treatment of*

21

*Animals, Inc. v. Miami Seaquarium*, 189 F. Supp. 3d 1327, 1341 (S.D. Fla. 2016) (finding

that plaintiff animal rights organization had *Havens* standing to challenge ESA violations);

*Animal Legal Defense Fund v. LT Napa Partners LLC*, 234 Cal. App. 4th 1270, 1281–82

(2015) (applying federal *Havens* standard to hold that ALDF had standing in state court).

Here, the drain on the plaintiffs' resources cannot be recompensed by damages after the

fact, because the ESA citizen suit provision does not provide for damages. *See Ass'n of*

*California Water Agencies*, 386 F.3d at 885.

The risk of irreparable harm to the plaintiffs and the wolves is sharply heightened

by the recent state court ruling that Fur-Ever Wild's "possession of exotic animals is

limited to one exotic animal under [local] ordinance" coupled with the defendants' usual

practice of unlawfully killing gray wolves presents an imminent risk that the defendants

will kill off their remaining wolves. Ex. B-6, Minnesota Court of Appeals Opinion in

*Eureka Township v. Petter*, A17-0020 (Sept. 5, 2017). A TRO or an injunction would

prevent such irreparable harm and preserve the *status quo*, by preventing any of the

defendants' currently-living wolves from being killed.

As discussed above, the plaintiffs have an interest in the gray wolves continuing to

live, and in the well-being of these animals. At a minimum, they have an interest in

obtaining relief so that they do not have to continue expending resources in response to

Fur-Ever Wild's anticipated gray wolf culls. Until the defendants comply with the ESA,

the plaintiffs are committed by their need to preserve reputation and credibility to continue

trying to compel Fur-Ever Wild's compliance with the law, such as by continuing to

investigate, putting public pressure on the defendants, working with law enforcement

officials, and exploring other legal or practical mechanisms. Ex. B, Liebman Decl. ¶ 29; Ex. A, Simmons Decl. ¶ 30. In addition, as long as the defendants can continue to kill the gray wolves, ALDF will likely need to field inquiries from concerned supporters, organizations, and members of the public about the killing of these wolves. Ex. B, Liebman Decl. ¶ 20.

### III. A BALANCE OF THE HARDSHIPS TIPS IN THE PLAINTIFFS' FAVOR, AND THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF.

As demonstrated by the ESA itself and the case law, the protection of threatened and endangered species is unequivocally in the public interest. Moreover, the interests of ALDF, Lockwood, and the wolves themselves will be irreversibly damaged if the wolves are killed. By contrast, an injunction simply prohibits Fur-Ever Wild from engaging in a discrete and unlawful activity that will not impact her other activity. Such a discrete and narrowly tailored injunction is far from a TRO that, for example, requires a developer to send home dozens of contractors in the middle of a construction project.

Congress passed the ESA in recognition that species in danger or threatened with extinction "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). Enforcement of the ESA therefore promotes numerous national values, just as violation of the ESA undermines those values. As other courts have recognized, Congress has already "decided that the balance of hardships and the public interest tip heavily in favor of endangered species. [This court] may not use equity's scales to strike a different balance." *Sierra Club v. Marsh, 816 F.2d 1376, 1383 (9th Cir. 1987); Bensman v. U.S. Forest Serv.*, 984 F. Supp. 1242,

23

1245–46 (W.D. Mo. 1997).

In an ESA case, the Eighth Circuit agreed with a district court holding "that the balance of harms favored the plaintiffs because absent an injunction there would be environmental injury which, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration." *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 996–97 (8th Cir. 2011) (internal quotation marks omitted). The Circuit affirmed the district court's grant of a preliminary injunction, and agreed with the lower court's holding that, "environmental harm outweigh[s] monetary harm." *Id.* at 997 (internal quotation marks omitted).

Similarly, presented with a TRO request in an ESA action like this one, a court in this Circuit held that, "[d]ue to the strong policy in favor of protecting endangered animals, [ ] the balance of harms and the public interest weigh in favor of granting a temporary restraining order." *Kuehl II*, 2016 WL 9114915, at *2. A second court in this Circuit held that, "[w]hen an endangered species is allegedly jeopardized, the balance of hardships and public interest tip in favor of the protected species." *National Wildlife Federation v. Harvey*, 440 F. Supp. 2d 940, 958 (E.D. Ark. 2006). The courts in *Kuehl II, National Wildlife Federation*, and *Bensman* therefore all granted emergency injunctive relief to stop behavior that would allegedly harm a protected species. 2016 WL 9114915, at *2; 440 F. Supp. 2d at 943; 984 F. Supp. at 1250.

Moreover, the defendants will suffer no legally-cognizable hardship from an order to cease killing their wolves. The defendants may argue that, in being prevented from killing their animals, they lose money that they would have made selling the dead animals'

fur, tails, and carcasses. However, it is illegal to sell the fur, tails, or carcasses of a threatened species. *See United States v. Hill*, 896 F. Supp. 1057, 1058–59 (D. Colo. 1995) ("The Lacey Act, 16 U.S.C. § 3371 *et seq.,* makes it unlawful for any person to ' . . . sell . . . any . . . wildlife which has been taken . . . in violation of any law . . . or regulation of the United States.' 16 U.S.C. § 3372(a)(1). As in the ESA, . . . wildlife includes any . . . product of such animal, whether dead or alive. 16 U.S.C. § 3371(a). The ESA, and any regulation promulgated thereunder, is a 'law, treaty or regulation' of the United States, the violation of which, may give rise to prosecution under §§ 3372(a)(1) & (4), 3373(d)(1)(B) and 3373(d)(2).") (internal brackets and ellipsis omitted); *see also United States v. Dion*, 752 F.2d 1261, 1270 (8th Cir. 1985) (affirming conviction for selling parts of protected species).

Therefore, the only financial loss that may result to the defendants as a result of the granting of injunctive relief is the loss of an opportunity to make an illegal sale. Such a putative hardship is not legally cognizable. For this court to rule otherwise would be to suggest that a criminal's ability to continue selling contraband—such as a drug dealer's ability to continue selling narcotics—is a legally-cognizable financial hardship, which must be considered in deciding whether to enjoin the criminal's activities.

This case differs from a typical ESA case, in which an entity seeks to carry out a lucrative, and otherwise lawful, action, which inadvertently results in harm to a protected species. For instance, in *Sierra Club v. U.S. Army Corps of Engineers*, the plaintiffs sought to interfere with construction of a power plant. 645 F.3d at 983. The injunction sought could have cost up to $11 million per month, due to idle equipment, equipment

25

demobilization, and contractor demobilization. *See id.* at 996. Nonetheless, the balance of the hardships favored the plaintiffs. *See id.* at 997. Here, by contrast, the defendants are intentionally killing protected animals in order to illegally sell their parts, and the relief sought is exactly tailored to prevent this unlawful killing. The TRO or preliminary injunction will not prevent the defendants from engaging in any lawful business.

To contrast with the lack of harm to the defendants, the continued killing of these protected animals represents a serious organizational harm to the plaintiffs, as well as a grave harm to the wolves themselves and the public who cares about them.

For these reasons, the balance of the hardship tips heavily in the plaintiffs' favor, and the public interest favors an injunction.

**IV.   THIS COURT SHOULD EXERCISE ITS DISCRETION TO WAIVE ANY BOND, GIVEN THE IMPORTANT PUBLIC INTERESTS SERVED BY THE REQUESTED INJUNCTION.**

The plaintiffs ask that any bond requirement be waived for this emergency injunctive relief. "It [is] permissible for the district court to waive the bond requirement based on its evaluation of public interest in [a] specific case." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016). Environmental protection is one such public interest which favors waiving a bond. *See id.* at 1043 (affirming waiver of bond in environmental law case and observing that courts have frequently waived bond requirement in cases involving particular environmental statute).

Here, as discussed above, the public interest is greatly in favor of the emergency injunctive relief that the plaintiffs seek, and the bond requirement should thus be waived.

Various legal precedents recognize that animal protection is in the public interest. In *United States v. Stevens*, Justice Alito supported his dissenting opinion that there was a compelling interest to restrict animal crush videos under the First Amendment (an issue never reached by the majority) by emphasizing animals' significant capacity to suffer: "animals used in crush videos are living creatures that experience excruciating pain [and] [o]ur society has long banned such cruelty…." 559 U.S. at 495-97 (2010) (Alito, S., dissenting); *see also Newcomb*, 359 Or. 756 (2016) (veterinarian's warrantless withdrawal and testing of abused dog's blood to administer medical treatment did not violate the Fourth Amendment); *Animal Legal Defense Fund v. Espy*, 23 F.3d 496, 503 (D.C. Cir. 1994) (mentioning "public interest in animal welfare"); *Dicesare v. Stout*, 992 F.2d 1222 (10th Cir. 1993) (repeating rule regarding "public interest in preservation of life in general and in prevention of cruelty to animals in particular"); *Pennsylvania Co. for Ins. on Lives & Granting of Annuities v. Helvering*, 66 F.2d 284, 287 (D.C. Cir. 1933) ("It is certainly in the public interests to correct and prevent the reckless or useless dissection of animals.").

## CONCLUSION

For the foregoing reasons, and based on the sworn declarations attached hereto, Plaintiffs the Animal Legal Defense Fund and Lockwood Animal Rescue Center respectfully request that the Court grant their Motion for Temporary Restraining Order and grant them the relief requested below as set out in the proposed order being submitted contemporaneously to this Court.

## RELIEF SOUGHT

The plaintiffs seek a narrowly-tailored TRO or preliminary injunction to halt the

defendants' ongoing legal violations.

Specifically, the plaintiffs ask that the defendants and their respective officers, agents, servants, employees, attorneys, and persons acting in concert with them are hereby ENJOINED AND RESTRAINED from:

1. Killing, harming, or harassing any of the approximately sixty animals with any gray wolf lineage that are under the defendants' ownership, possession, custody, care, or control;

2. Paying, contracting, or arranging for such animals to be killed, harmed, or harassed;

3. Intentionally, recklessly, negligently, or knowingly allowing such animals to die;

4. Transferring ownership, possession, custody, or control of such animals to any entity or individual other than (a) Lockwood, or another animal sanctuary or rescue organization stipulated to by the plaintiffs, (b) an animal sanctuary or rescue organization accredited or verified by the Global Federation of Animal Sanctuaries, or (c) any other bona fide animal sanctuary or rescue organization approved by this court;

Further, to help the plaintiffs and the Court enforce this order, the Court should order defendants to file within 7 days from the entry of this order a census with the name, age, and description of all animals known or suspected to have any amount of gray wolf lineage that are under the defendants' ownership, posseession, custody, care, or control.

28

Respectfully submitted,


DATED: October 6, 2017              /s/Christopher A. Berry
                                    Christopher Berry (CA Bar No. 283987)
                                    *Admitted Pro Hac Vice*
                                    cberry@aldf.org
                                    ANIMAL LEGAL DEFENSE FUND
                                    525 E. Cotati Ave.
                                    Cotati, CA 94931
                                    T: (707) 795-2533 ext. 1041
                                    F: (707) 795-7280

                                    Anthony T. Eliseuson (MN Bar No. 0335630)
                                    aeliseuson@aldf.org
                                    ANIMAL LEGAL DEFENSE FUND
                                    1755 W. Roscoe Street, Unit 3
                                    Chicago, Illinois 60657
                                    T: (707) 795-2533
                                    F: (707) 795-7280


                                    **Attorneys for Plaintiffs**


29

## CERTIFICATE OF COMPLIANCE

This Memorandum complies with the limits in Local Rule 7.1(f), and with the type-size limit of Local Rule 7.1(h). This memorandum is set in a proportional font, and contains 7,808 words, excluding the caption, signature, and certificate of compliance. In determining this number, I have relied on the word-count function of my word-processing software. That function was applied to include all text, including headings, footnotes, and quotations, except for the caption, signature, and certificate of compliance. The software used to generate this count was Microsoft Word 2013.

DATED: October 6, 2017              */s/Christopher A. Berry*
                                    Christopher A. Berry
                                    ANIMAL LEGAL DEFENSE FUND

                                    **Attorney for Plaintiffs**